IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
MUSKOGEE DIVISION

| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 6:21-CR-198-RAW |
|---|---|
| v. | |
| JIMMY NACE | |

### JIMMY NACE'S MOTION IN LIMINE TO EXCLUDE TESTIMONY THAT VIOLATES MR. NACE'S DUE PROCESS RIGHTS

COMES NOW Defendant, JIMMY NACE, by and through undersigned counsel, and moves this Court to limit the testimony of government witnesses that violates Mr. Nace's due process rights.

Mr. Nace has been charged with first degree murder with co-defendant Matthew Vermillion. Tyler Morgan was also investigated and avoided prosecution only because he was prosecuted by military court martial and the government agreed not to prosecute Mr. Morgan in exchange for his testimony. Mr. Vermillion and Mr. Morgan are expected to testify that Mr. Nace and Mr. Dalpoas got into a fight at their house. Further, they would testify that after the fight they believed Mr. Dalpoas died during the fight. Afterwards, they moved Mr. Dalpoas' body from the house to a cemetery where they dropped a stone bench on Mr. Dalpoas' head and lit him on fire.

More importantly, the government has endorsed the theory that Mr. Dalpoas was dead at the house by allowing Mr. Vermillion to enter a plea to an information charging him with being an accessory after the fact based on conduct that occurred after leaving the house. Mr. Morgan entered a plea to a similar charge in the military court martial. However, Mr. Nace anticipates that the government will take an inconsistent position during Mr. Nace's trial. Specifically, Mr. Nace anticipates that the government will argue that Mr. Dalpoas was still alive after leaving the Dalpoas house and while in the cemetery. Allowing this inconsistent evidence would violate Mr. Nace's due process rights.

The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. *See* A.B.A. Standards for Criminal Justice, 4th Ed. (2017) § 3-1.2(b); A.B.A. Model Rules of Professional Responsibility, 3.8; *see also Berger v. United States,* 295 U.S. 78, 88 (1935). This is so because, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

A fair trial in a fair tribunal is a basic requirement of due process. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). A prosecutor violates the Due Process Clause if he knowingly presents false testimony—whether it goes to the merits of the case or solely to a witness's credibility. *Napue v. Illinois,* 360

U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1935). "Moreover, for a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases—and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence—surely raises a serious question of prosecutorial misconduct." *Jacobs v. Scott*, 513 U.S. 1067, 115 S. Ct. 711, 712, 130 L. Ed. 2d 618 (1995) (Stevens, J., dissenting from denial of cert.). Justice Steven's argument holds true even in non-capitol cases: it is misconduct for the government to take contradictory and inconsistent positions on the facts of a case and to endorse wholly different versions of the events merely to secure convictions of different defendants.

The Eleventh Circuit addressed this issue in a case where the prosecutor argued that one defendant was the murderer at one trial, and then in a subsequent trial, argued that a different defendant committed the offense. *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985). Judge Clark noted that "[i]n this case it is not clear what the prosecutor actually believed" because of the inconsistent positions taken in the proceedings for each defendant. *Id*. at 1479 (Clark, J., concurring).

> [A]ll we can say for certain is that the prosecutor attacked William Campbell's testimony at his trial as unbelievable and argued that Campbell must have been the sole murderer. The jury accepted the prosecutor's version of the events as true and rendered a verdict accordingly. One year later, William Campbell was called as the principal witness in Henry Drake's trial. The conclusion seems inescapable that the prosecutor obtained Henry Drake's conviction

3

> through the use of testimony he did not believe; bringing this case under the logical if not actual factual framework of *Mooney* and *Napue.*

*Id.*

The government "cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." *Id.* In *Drake*, the prosecutor changed his theory of what happened to suit the state in the separate prosecutions of Campbell and Drake, and his distortion rendered Henry Drake's trial fundamentally unfair. *Drake* 762 F.2d at 1479 (Clark, J., concurring).

In *Smith v. Groose*, the Eighth Circuit also addressed the state's use of inconsistent factual theories to secure convictions of multiple defendants: "Smith contends that this manipulation of the evidence deprived him of due process and rendered his trial fundamentally unfair. We agree. The State's use of factually contradictory theories in this case constituted 'foul blows,' error that fatally infected Smith's conviction. Even if our adversary system is 'in many ways, a gamble,' that system is poorly served when a prosecutor, the state's own instrument of justice, stacks the deck in his favor." *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000) (internal citation omitted).

The government should not be permitted to engage in this strategy in Mr. Nace's trial. At issue in Mr. Nace's trial is not merely a change in legal theory, but the endorsement by the government of different facts than those used to support Mr.

4

Vermillion's plea (and to support Mr. Morgan's court martial)—such gamesmanship would violate Mr. Nace's right to due process.

First, and foremost, the government filed an information against Mr. Vermillion, allowing him to enter a plea to accessory after the fact in violation of 18 U.S.C. § 3. (Doc. 83). More specifically, in the plea agreement, the government and Mr. Vermillion agreed that Mr. Dalpoas was dead after the fight and before going to the cemetery. (Doc. 92 at 2-3). In their factual basis, the government and Mr. Vermillion agreed that

> On or about July 3, 2019, knowing that an offense against the United States, to wit: Murder in Indian Country, in violation of 18 U.S.C. llll(a), 1151, and 1153, *had been committed* against Bobby Joe Dalpoas, Jr., I did assist the offender, Jimmy Holmes Nace, by hindering and preventing his apprehension, trial, and punishment. Specifically, I helped Mr. Nace and another individual load Mr. Dalpoas' body in the back of my truck after thinking he was dead, drove the body to the Red Oak Cemetery in the Bache area of Pittsburg County, Oklahoma, helped unload the body at the cemetery, and drove Mr. Nace and this other individual away from the cemetery. Although believed Mr. Dalpoas to be dead before loading him into my truck, I never checked his pulse, did not take him to the hospital, nor did I do anything else to confirm if he was dead. At the cemetery, Mr. Nace dropped a cement bench on Mr. Dalpoas head and set him on fire. After witnessing Mr. Nace drop a cement bench on Mr. Dalpoas' head, I asked Mr. Nace what he was doing. Mr. Nace's response was "making sure he was dead." After witnessing Mr. Nace set Mr. Dalpoas on fire, I asked Mr. Nace again what he was doing. Mr. Nace's response was "getting rid of the evidence." I later agreed with Mr. Nace and the other individual involved in this matter that, if asked, we would tell people we went to Mr. Dalpoas' house the night/early morning of the murder, but he wasn't home. When first interviewed by law enforcement, this is what I told them. All of this occurred within the Eastern District of Oklahoma

and in Indian Country. At the time of the offense, I was a non-Indian and Mr. Dalpoas was an Indian and a member of a federally recognized tribe.

(*Id.*) (emphasis added). Even more to the point, during the Rule 11 hearing, Mr. Vermillion said, "Jimmy and Bobby got into a fight. Jimmy hit Bobby and he fell, and I thought he died. He wasn't breathing. And Jimmy said we need to get rid of the body, so we loaded him into my truck." (Transcript Change of Plea Hearing on January 20, 2022 at 24). Even before the Rule 11 hearing, Mr. Vermillion has maintained that Mr. Dalpoas was dead at the house. During an interview with law enforcement, Mr. Vermillion said, "he was fucking dead at the house." He went even further to say, "If we had [called the police at the house,] Jimmy would be facing manslaughter…."

Tyler Morgan, the government's other witness, has also taken a position similar to Mr. Vermillion, that Bobby Dalpoas was dead at the house. In Mr. Morgan's court martial, he was found not guilty of the offense of premeditated murder but found guilty of another offense with facts that substantiate accessory after the fact. Specifically, he was found guilty of

> that at or near Haileyville, Oklahoma, on or about 3 July, 2019, Jimmy Nace *had committed* an offense punishable by the Uniform Code of Military Justice, to wit: the murder of Bobby Dalpoas, did, at or near Bache, Oklahoma, on or about 3 July 2019, in order to prevent the apprehension of the said Jimmy Nace , assist the said Jimmy Nace in transporting Bobby Dalpoas' *body* from the scene of the murder and crushing Bobby Dalpoas' head with a concrete slab.

6

(emphasis added). During his court-martial, Mr. Morgan said this about the fight at the house,

> [a]fter a couple more blows to the head Bobby kind of stood up he looked dazed like he wasn't completely there at which point Jimmy continued to hit him. At that point Bobby had fell to the ground Jimmy got over him continued to beat him while he was on the ground after Bobby had hit the ground. After Jimmy had stopped and pulled back like got off of him we noticed that he was bleeding from the nose from his ear it didn't look like he was breathing.

In his written statement to law enforcement on August 6, 2019, the following exchange between Mr. Morgan and an investigator occurred:

A:   We thought Bobby was dead.

Q:   Why

A:   Didn't really see any sign of him breathing He was bloody but that wasn't really an indicator

Q:   Where was Bobby bleeding from

A:   It looked like his nose and ear

Q:   Was he moving

A:   No

Consistent with his written statement, during his interrogation with the military investigators, Mr. Morgan said, "We thought he was dead . . . he wasn't breathing or moving and there was blood pooling from his nose and ear." Later on in the interview, Mr. Morgan said, "[w]ell, we thought he was dead at the house," when the investigator asked when was he pretty certain that Bobby was dead.

7

Mr. Nace asks the Court to exclude from trial testimony that is inconsistent with the government's previous position in Mr. Vermillion's case and Mr. Morgan's case. The federal prosecutors in their prosecution of Matthew Vermillion conceded that Mr. Dalpoas was dead in the house. As described above, this is the position the federal prosecutors took in their Information charging Mr. Vermillion with being an accessory after the fact and their position in their Rule 11 hearing. The government's position is consistent with Mr. Vermillion's statements where he consistently says they believed Mr. Dalpoas was dead inside the house.

Furthermore, this Court is not left wondering what the prosecutor's position may be in Mr. Vermillion's case as the Court wondered in Drake. We know that the same prosecutor who filed the criminal information and drafted the factual basis for the Information against Mr. Vermillion is the same prosecutor handling Mr. Nace's trial. However, the same prosecutor is taking factually inconsistent positions in the same case.

The government's theory in Mr. Vermillion's case is consistent with that taken by military prosecutors in Mr. Morgan's court-martial. Mr. Morgan was convicted of a charge that is similar to that of accessory after the fact. In his statements to military investigators and during his court-martial, Mr. Morgan has consistently said that he believed Mr. Dalpoas was dead after the fight and before they left the house.

The government should not now be allowed to now change their theory of the case and prosecute Mr. Nace with the premeditated murder of Mr. Dalpoas. To do so would violate Mr. Nace's due process rights. If the prosecutors are allowed endorse one position in Mr. Vermillion's case and Mr. Morgan's case and present to the jury a different, "factually contradictory theory" in Mr. Nace's case, this would be a "foul blow" as *Smith v. Groose* concluded. It would constitute "mere gamesmanship" as contemplated by *Drake v. Kemp* and a violation of Mr. Nace's constitutional due process rights.

For these reasons, Mr. Nace requests that this Court limit the government's evidence to that which is consistent with the theory the government advanced during Mr. Vermillion's and Mr. Morgan's prosecution.

Respectfully submitted, this 11th day of March, 2022.

*J. Wesley Bryant*
J. WESLEY BRYANT
Georgia Bar No. 091621
Attorney for Mr. Nace

Federal Defender Program, Inc.
101 Marietta Street, N.W., Suite 1500
Atlanta, Georgia 30303
(404) 688-7530; Fax 404-688-0768
Wes_Bryant@fd.org

9

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Response to Government's Motion in Limine has been formatted in Times New Roman 14 point, in accordance with Local Rule 5.1B, and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following counsel of record:

> T. Cameron McEwen
> Assistant United States Attorney
> Eastern District of Oklahoma
> 520 Denison Ave
> Muskogee, OK 74401

Dated: This 11th day of March, 2022.

> *J. Wesley Bryant*
> J. WESLEY BRYANT
> Georgia Bar No. 091621
> Attorney for Mr. Nace